John S. Yanchunis (*pro hac vice*)
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 275-5272; Fax: (813) 222-4736
jyanchunis@ForThePeople.com

Abbas Kazerounian (SBN 249203)
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
(800) 400-6808; Fax: (800) 520-5523
ak@kazlg.com

William B. Federman (*pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560; Fax: (405) 239-2112
wbf@federmanlaw.com

*Interim Co-Lead Counsel for the Proposed Class*

[Additional Interim Class Counsel in Signature Block]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| Christine Hellyer, Angelica Ponce, Charles Warren, Destinee Richard, and Tammie Edwards, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br>v.<br><br>Smile Brands, Inc., Smile Brands Group Inc., and Smile Brands Finance Inc.,<br><br>                    Defendants. | Lead Case No.: 8:21-cv-01886- DOC-ADS<br><br>Hon. David O. Carter<br>Courtroom 9D<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Christine Hellyer, Angelica Ponce, Charles Warren, Destinee Richard, and Tammie Edwards (collectively, "Plaintiffs") bring this Consolidated Class Action Complaint against Defendants Smile Brands Inc. ("SBI"), Smile Brands Group Inc. ("SBG"), and Smile Brands Finance Inc. ("SBF") (SBI, SBG, and SBF are collectively referred to as "Smile Brands" or "Defendants") in their respective individual capacities and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## I.    INTRODUCTION

1.     This is a data breach class action arising out of Defendants' failure to implement and maintain reasonable security practices to protect consumers' sensitive personal information. Smile Brands is one of the largest dental service organizations in the United States comprised of over 700 affiliated dental offices, which it provides comprehensive business support services to through exclusive long-term agreements.

2.     For its business purposes, Defendants obtain, store, and transmit personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Confidential Information") from its patients, including but not limited to their names, addresses, telephone numbers, Social Security numbers, dates of birth, health insurance information, diagnosis information, and/or other information.[1]

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d, *et seq.* ("HIPAA"), PHI is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, *available at*: https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Sept. 14, 2020).

3.     On or about August 9, 2021, Smile Brands announced that it suffered a ransomware attack on April 24, 2021, which compromised certain of its systems that contained Plaintiffs' and Class members' Confidential Information (the "Data Breach"). As a result, unauthorized cybercriminals acquired, had access to, and/or viewed all Plaintiffs' and Class members' name, address, telephone number, date of birth, health insurance information, and/or diagnosis information. For Plaintiffs Ponce and Warren, and other Class members, Defendants' failures allowed the unauthorized third parties to acquire, access, and view Plaintiffs' and Class members' Social Security numbers, personal financial information, government-issued identification number, and/or personal health information.

4.     Although Defendants knew about the Data Breach and knew that sensitive information was in the hands of malicious actors, it waited nearly five months after the Data Breach, on September 28, 2021, to notify Plaintiffs and Class members that their information had been compromised.

5.     The Data Breach happened as a result of Defendants' inadequate cybersecurity and its affirmative acts, which caused Plaintiffs' and the Class members' Confidential Information to be accessed, exfiltrated, and viewed by unauthorized cybercriminals. This action seeks to remedy Defendants' failings. Plaintiffs bring this action on behalf of themselves and all affected individuals.

6.     To date, Defendants have not yet disclosed full details of the Data Breach or the results and findings of any investigation it undertook. Without such disclosure, questions remain as to the full extent of the cyberattack, the number of patients involved, the full extent of the data accessed, compromised, disclosed, and viewed, and what measures, if any, Defendants have taken to secure the information still in its possession. Through this litigation, Plaintiffs will determine the scope of the Data Breach, the information involved, obtain relief that redresses the harms to Plaintiffs and Class members, and ensure Defendants have proper measures in place to prevent another breach from occurring in the future.

7.     Defendants' notice to Plaintiffs and Class members was misleading and inadequate, providing no explanation why the notice was delayed for two months between discovering the breach and notifying the affected individuals. The notices Defendants provided to Plaintiffs and Class members were unclear and devoid of many of the details surrounding the Data Breach, requiring Plaintiffs to spend time and/or money taking additional steps to protect themselves from the harmful effects of the Data Breach.

8.     The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect patients' Confidential Information. In particular, Smile Brands affirmatively acted when it maintained the Confidential Information on Smile Brand's computer network in a condition vulnerable to cyberattacks, including through infiltration of Smile Brand's network through a ransomware attack. The mechanism of the cyberattack and the potential for improper disclosure of Plaintiffs' and Class members' Confidential Information was a known risk to Defendants, and thus Defendants were on notice that failing to take reasonable steps necessary to secure the Confidential Information from those risks left the Confidential Information in a vulnerable position.

9.     Defendants disregarded the rights of Plaintiffs and Class members by, among other things, intentionally, affirmatively, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure their data systems were protected against unauthorized intrusions; failing to disclose that they did not have reasonable or adequately robust computer systems and security practices to safeguard patients' Confidential Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to monitor and timely detect the Data Breach; and failing to provide Plaintiffs and Class members prompt and accurate notice regarding the Data Breach.

10.     As a result of Defendants' failure to implement and follow reasonable security procedures, Plaintiffs' and Class members' PII and PHI are now in the hands of, and have been viewed by, identity thieves. Plaintiffs and Class members have suffered

and/or are at a heighted risk of identity theft and fraud, have had to spend and will continue to spend significant amounts of time and/or money in an effort to protect themselves from the adverse ramifications of the Data Breach, and will forever be at a heightened risk of identity theft and fraud.

11.    Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of Plaintiffs' and Class members' Confidential Information that Defendants collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and Class members that their information had been subject to the unauthorized access of an unknown third party and precisely what specific type of information was accessed.

12.    Plaintiffs, on behalf of all others similarly situated, allege claims for (1) violation of the Confidentiality of Medical Information Act (Cal. Civ. Code § 56, *et seq.*); (2) negligence; (3) breach of contract; (4) breach of implied contract; (5) violation of the California Unfair Competition Law (Cal. Business & Professions Code § 17200, *et seq.*) for unlawful, fraudulent, and unfair business practice; (6) invasion of privacy (7) violation of California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, *et seq.*); (8) violation of California Consumer Records Act (Cal. Civ. Code § 1798.82, *et seq.*); and (9) injunctive and declaratory relief.

13.    Plaintiffs seek remedies including, but not limited to, compensatory damages for identity theft, fraud, and time spent, reimbursement of out-of-pocket costs, adequate credit monitoring services funded by Defendants, and injunctive relief including improvements to Defendants' data security systems and practices to ensure they have reasonably sufficient security practices to safeguard patients' Confidential Information that remains in Defendants' custody to prevent incidents like the Data Breach from reoccurring in the future.

14.    As a direct and proximate result of Defendants' wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and Class members' Confidential Information, Plaintiffs have incurred (and

will continue to incur) economic damages, and other actual injury and harm, in the form of (i) actual identity theft or identity fraud; (ii) the untimely and/or inadequate notification of the Data Breach; (iii) unauthorized disclosure of their Confidential Information; (iv) breach of the statutorily-protected confidentiality of their Confidential Information; (v) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud caused by the Data Breach; (vi) the value of their time spent mitigating the impact of the Data Breach and mitigating increased risk of identity theft and/or identity fraud; (vii) deprivation of the value of their Confidential Information, for which there is a well-established national and international market; and (viii) the impending, imminent, and ongoing increased risk of future identity theft, identity fraud, economic damages, and other actual injury and harm.

## II.     PARTIES

15.     Plaintiff Angelica Ponce is a resident of Bell, California, and a former employee and/or patient of Defendants. Plaintiff Ponce received notice from Defendants dated September 28, 2021. She received a "Notice of Data Breach" letter addressed to her indicating that her Confidential Information, including protected health information (PHI),  had been improperly disclosed to unauthorized third parties through a "a cybersecurity incident." While the full extent of the Confidential Information compromised as a result of the Data Breach is solely in the possession of Defendants at this time, Defendants notified Plaintiff Ponce that it disclosed and there had been unauthorized access to, a minimum, her name, address, telephone number, date of birth, Social Security number, personal financial information, government-issued identification number, and/or personal health information. Later, Defendants sent Plaintiff Ponce another "Notice of Data Breach" letter dated October 22, 2021, which contained a different list of what information was involved in the Data Breach.  This letter stated, "[t]he information involved may include your name, address, telephone number, date of birth, health insurance information, and/or diagnosis information.  On November 18,

2021, Plaintiff Ponce's counsel sent a letter to Smile Brands via certified mail providing it with notice of Plaintiff Ponce's potential claims arising from the Data Breach.

16.     Plaintiff Charles Warren is a resident of Los Angeles County, California, and a former employee and patient of Defendants. Between 2009 and 2014, Plaintiff Warren was an employee of Smile Brands Financial Inc. at Defendants' corporate offices in Irvine, California.  In or around 2013, Plaintiff Warren received services from Smile Brands in Costa Mesa, California.  In early October 2021, Plaintiff Warren received a "Notice of Data Breach" letter addressed to him from Smile Brands, stating that "a cybersecurity incident that may have involved certain health or other personal information about you," and indicating that his Confidential Information, including protected health information (PHI), had been improperly disclosed to unauthorized third parties. While the full extent of the Confidential Information compromised as a result of the Data Breach is solely in the possession of Defendants at this time, Smile Brands notified Plaintiff Warren that it disclosed, a minimum, his name, address, telephone number, date of birth, Social Security number, personal financial information, government-issued identification number, and/or personal health information. On October 28, 2021, Plaintiff Warren's counsel sent a letter to Smile Brands' registered service agent via certified mail providing it with notice of Plaintiff Ponce's potential claims arising from the Data Breach.

17.     Plaintiff Christine Hellyer is a resident of Crystal River, Florida, and a patient of Defendants. On or about September 28, 2021, Plaintiff Hellyer received a "Notice of Data Breach" from Smile Brands, which indicated that her Confidential Information, including protected health information (PHI), had been improperly disclosed to unauthorized third parties. While the full extent of the Confidential Information compromised as a result of the Data Breach is solely in the possession of Defendants at this time, Smile Brands notified Plaintiff Hellyer that it disclosed, a minimum, her name, address, telephone number, date of birth, health insurance information, and/or diagnosis information.

18.    Plaintiff Destinee Richard is a resident of Long Beach, California, and a patient of Defendants. On or about September 28, 2021, Plaintiff Richard received a "Notice of Data Breach" letter from Smile Brands, which indicated that her Confidential Information, including protected health information (PHI), had been improperly disclosed to unauthorized third parties. While the full extent of the Confidential Information compromised as a result of the Data Breach is solely in the possession of Defendants at this time, Smile Brands notified Plaintiff Richard that it disclosed, a minimum, her name, address, telephone number, date of birth, health insurance information, and/or diagnosis information.

19.    Plaintiff Tammie Edwards is a resident of Orange County, California, and a patient of Defendants. On or about November 5, 2021, Plaintiff Edwards received a "Notice of Data Breach" letter from Smile Brands, which indicated that her Confidential Information, including protected health information (PHI), had been improperly disclosed to unauthorized third parties. While the full extent of the Confidential Information compromised as a result of the Data Breach is solely in the possession of Defendants at this time, Smile Brands notified Plaintiff Edwards that it disclosed, a minimum, her name, address, telephone number, date of birth, health insurance information, and/or diagnosis information.

20.    Defendant Smile Brands Inc. is a Washington corporation with its principal place of business in Orange County, California. SBI provides comprehensive business support services, including administrative, marketing, and financial aspects, through exclusive long-term agreements with affiliate dental groups.  As such, SBI operates as a medical service organization that provides services to its affiliate dental groups.

21.    Defendant Smile Brands Finance Inc. is a Delaware corporation with its principal place of business in Orange County, California.

22.    Defendant Smile Brands Group Inc. is a Delaware corporation with its principal place of business in Orange County, California.

23.    Upon information and belief, at all times relevant, Defendants Smile Brands

Inc., Smile Brands Finance Inc., and Smile Brands Group Inc., collectively had access to, maintained, and shared responsibility for safeguarding the data which was subject to the Data Breach at issue herein.

24. All of Plaintiffs' claims stated herein are asserted against Defendants and any of its owners, predecessors, successors, subsidiaries, affiliates, agents and/or assigns.

## III.   JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

26. This Court has personal jurisdiction over Defendants because Smile Brands are headquartered in California, their principal place of business is in California, and they regularly conduct business in California.

27. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in, was directed to, and/or emanated from this District, Smile Brands are based in this District, Smile Brands maintain patients' Confidential Information in the District, and have caused harm to Plaintiffs and Class members residing in this District.

## IV.   STATEMENT OF FACTS

### A.   *Smile Brand's Business*

28. Smile Brands is a national management services company that provides services to dental offices. Smile Brands has over 700 offices and 50 affiliated brands across 30 states. Based on information and belief, Smile Brands receives the Confidential Information of Plaintiffs and Class members through its affiliate dental offices who have contracted with Smile Brands and have collected that information.

29. Defendants collected and stored Plaintiffs' and Class members' most sensitive and private information, including, but not limited to, name, address, telephone

number, Social Security number, date of birth, health insurance information, and/or diagnosis information.

30.     Plaintiffs and Class members relied on Defendants to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Plaintiffs and Class members believed Defendants would implement adequate security to safeguard their PII and PHI.

31.     Defendants had a duty to adopt reasonable measures to protect Plaintiffs' and Class members' PII and PHI from involuntary disclosure to third parties.

### B.     The Data Breach

32.     On or about September 3, 2021, Defendants reported the Data Breach to the Attorney General of California and submitted a sample notice of the Data Breach, which included the following:

> **What happened?** On April 24, 2021, we became aware of a ransomware attack, which led to unauthorized access to certain systems containing protected health information (PHI). We promptly terminated the unauthorized access to the affected systems, launched an investigation, notified law enforcement, and engaged leading cybersecurity firms to help assess the scope of the incident. Unfortunately, certain data appears to have been acquired by an unauthorized third party.
>
> **What information was involved?** The information involved may include your name, address, telephone number, date of birth, health insurance information, and/or diagnosis information.
>
> What we are doing. We are working with leading cybersecurity firms to support our investigation and further enhance our security measures, including implementing heightened monitoring and additional information security safeguards.[2]

33.     On or about September 28, 2021, Defendants sent a notice of the Data Breach to Plaintiffs and Class members in substantially the same form as the sample notice submitted to the Attorney General of California.

34.     On or about October 8, 2021, Defendants reported the Data Breach to the Maine Attorney General and submitted a sample breach notice, which was substantially

---

[2]    https://oag.ca.gov/system/files/Sample%20Individual%20Notice.PDF    (last    visited February 21, 2022).

similar to the Notice of Data Breach sent to Plaintiffs but identified different data elements, as follows:

> What information was involved? The information involved may include your name, address, telephone number, date of birth, Social Security number, personal financial information, government-issued identification number, and/or personal health information.

35.     On an unknown date, one of Defendants' affiliates posted a "Substitute Notice of Cybersecurity Incident" on its website (the "Website Notice") referring to the Data Breach, which states that Defendants, "on behalf of its affiliated dental practices, is notifying individuals regarding a cybersecurity incident."   The Website Notice identified more than 50 "affiliated data groups" that "may have [patient] information impacted by this incident."[3]

36.     Defendants admitted in the sample notices filed with the California and Maine Attorney General and the Website Notice that an unauthorized party acquired data that contained sensitive information about Plaintiffs and Class members, including name, address, date of birth, telephone number, health insurance information, Social Security number, personal financial information, government-issued identification number, diagnosis information, and/or personal health information.

37.     In response to the Data Breach, Defendants claimed they were "working with leading cybersecurity firms to support our investigation and further enhance our security measures, including implementing heightened monitoring and additional information security safe-guards." However, the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiffs and Class members, who retain a vested interest in ensuring that their information remains protected.

38.     Plaintiffs' and Class members' unencrypted information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII

---

[3]  https://mountaindental.com/details-on-a-cybersecurity-incident/

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and PHI for targeted marketing without the approval of Plaintiffs and Class members. Unauthorized individuals can easily access and view the PII and PHI of Plaintiffs and Class members.

39.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class members, causing their PII and PHI to be exposed to unauthorized access, viewing, and acquisition by unauthorized third parties.

### C.     *The U.S. Department of Health and Human Services Breach Report*

40.     According to the U.S. Department of Health and Human Services, Smile Brands reports that the Data Breach affected 199,683 individuals. The June 24, 2021 submission characterizes the Data Breach as a "Hacking/IT Incident" and further indicates that the "Location of Breached Information" was "Network Server."

41.     The Breach Report filed by Smile Brands on or around June 24, 2021, with the Secretary of the U.S. Department of Health and Human Services, was filed in accordance with 45 CFR § 164.408(a).

42.     Plaintiffs' and Class members' Confidential Information is "protected health information" as defined by 45 CFR § 160.103.

43.     Pursuant to 45 CFR § 164.408(a), Breach Reports are filed with the Secretary of the U.S. Department of Health and Human Services "following the discovery of a breach of unsecured protected health information."

44.     45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

45.     45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

46.    Plaintiffs' and Class members' Confidential Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

47.    As a result of the Data Breach, Plaintiffs' and Class members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E.

48.    Based on information and belief, Defendants themselves believe that as a result of the Data Breach, Plaintiffs' and Class members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart.

49.    As a result of the Data Breach, Plaintiffs' and Class members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

50.    Based on information and belief, Defendants themselves reasonably believe Plaintiffs' and Class members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

51.    As a result of the Data Breach, Plaintiffs' and Class members' unsecured protected health information was acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

52.    As a result of the Data Breach, Plaintiffs' and Class members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

53.    Based on information and belief, Defendants themselves as a result of the Data Breach reasonably believe Plaintiffs' and Class members' unsecured protected

health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

54.    It is reasonable to infer that as a result of the Data Breach Plaintiffs' and Class members' unsecured protected health information that was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

55.    It should be rebuttably presumed that unsecured protected health information acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

56.    After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is reasonable for recipients of that notice, including Plaintiffs and Class members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

## D.    Plaintiffs' Efforts to Secure Their Confidential Information

**Angelica Ponce**

57.    Plaintiff Ponce was previously employed with a Smile Brand Affiliate in Pico Rivera, California, and/or received services from a Smile Brand affiliate in California. In connection with her employment and/or the services that were to be performed by Defendants' affiliate, Plaintiff Ponce provided Confidential Information to the Smile Brands affiliate with the expectation that this information would be kept confidential and not disclosed to unauthorized parties.

58.    After she received the Data Breach notification letter, Plaintiff Ponce spent numerous hours taking action to mitigate the impact of the Data Breach, which included diligently checking her credit monitoring service and/or her financial accounts. This is time Plaintiff Ponce otherwise would have spent performing other activities or leisurely events for the enjoyment of life, rather than monitoring her financial accounts and

1  disputing fraudulent transactions.  This loss of time was a direct result of the Data Breach.

2  59.   Subsequent to the Data Breach, Plaintiff Ponce experienced actual fraud in

3  the form of unauthorized and fraudulent banking activities.

4  60.   As a result of the Data Breach, Plaintiff Ponce has suffered invasion of

5  privacy and emotional distress as a result of the release of her protected health information

6  which she expected Defendants to protect from disclosure, including anxiety, concern,

7  and unease about unauthorized parties viewing and potentially using her personal and

8  medical information. Plaintiff Ponce further suffers from additional anxiety, concern, and

9  unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's

10  personal and medical information in the future.

11  61.   Plaintiff Ponce suffered actual injury from having her Confidential

12  Information exposed as a result of the Data Breach including, but not limited to (a) paying

13  monies to Defendants for its goods and services which she  would not have had

14  Defendants disclosed that it lacked data security practices adequate to safeguard patients'

15  Confidential Information from theft; (b) damages to and diminution in the value of her

16  Confidential Information—a form of intangible property that Plaintiff Ponce entrusted to

17  Defendants as a condition for healthcare services; (c) loss of her privacy; (d) lost time;

18  and (e) imminent and impending injury arising from the increased risk of fraud and

19  identity theft.

20  62.   As a result of the Data Breach, Plaintiff Ponce will continue to be at

21  heightened risk for medical fraud, additional identity theft, and attendant damages, for

22  years to come.

23  **Charles Warren**

24  63.   In or around 2013, Plaintiff Warren received services from a Smile Brand

25  affiliate in Costa Mesa, California. In connection with the services that was to be

26  performed by the Smile Brands affiliate, Plaintiff Warren provided Confidential

27  Information to the affiliate with the expectation that this information would be kept

28  confidential and not disclosed to unauthorized parties.

64.     After he received his Data Breach notification letter, Plaintiff Warren spent time taking action to mitigate the impact of the Data Breach. This is time Plaintiff Warren otherwise would have spent performing other activities or leisurely events for the enjoyment of life. This loss of time was a direct result of the Data Breach.

65.     Plaintiff Warren suffered actual injury from having his Confidential Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Defendants for its goods and services which he would not have had Defendants disclosed that it lacked data security practices adequate to safeguard patients' Confidential Information from theft; (b) damages to and diminution in the value of his Confidential Information—a form of intangible property that Plaintiff Warren entrusted to Defendants as a condition for healthcare services; (c) loss of his privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft..

66.     As a result of the Data Breach, Plaintiff Warren will continue to be at heightened risk for medical fraud, identity theft, and the attendant damages, for years to come.

**Christine Hellyer**

67.     In April 2021, Plaintiff Hellyer received services from a Smile Brand affiliate in Crystal River, Florida. In connection with the services that was to be performed by the Smile Brands affiliate, Plaintiff Hellyer provided Confidential Information to the affiliate with the expectation that this information would be kept confidential and not disclosed to unauthorized parties.

68.     After she received the Data Breach notification letter, Plaintiff Hellyer spent numerous hours taking action to mitigate the impact of the Data Breach, which included diligently checking her credit monitoring service and/or her financial accounts. This is time Plaintiff Hellyer otherwise would have spent performing other activities or leisurely events for the enjoyment of life.  This loss of time was a direct result of the Data Breach.

69.     Subsequent to the Data Breach, Plaintiff Hellyer experienced actual fraud in

the form of her receipt of numerous suspicious telephone calls.

70.     As a result of the Data Breach, Plaintiff Hellyer has suffered emotional distress as a result of the release of her protected health information which she expected Defendants to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing and potentially using her personal and medical information. Plaintiff Hellyer further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

71.     Plaintiff Hellyer suffered actual injury from having her Confidential Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Defendants for its goods and services which she  would not have had Defendants disclosed that it lacked data security practices adequate to safeguard patients' Confidential Information from theft; (b) damages to and diminution in the value of her Confidential Information—a form of intangible property that Plaintiff Hellyer entrusted to Defendants as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

72.     As a result of the Data Breach, Plaintiff Hellyer will continue to be at heightened risk for medical fraud, identity theft, and the attendant damages, for years to come.

**Destinee Richard**

73.     Prior to the Data Breach, Plaintiff Richard received services from a Smile Brand affiliate in. In connection with the services that was to be performed by the Smile Brands affiliate, Plaintiff Richard provided Confidential Information to the affiliate with the expectation that this information would be kept confidential and not disclosed to unauthorized parties.

74.     After she received the Data Breach notification letter, Plaintiff Richard spent numerous hours taking action to mitigate the impact of the Data Breach. This is time

Plaintiff Richard otherwise would have spent performing other activities or leisurely events for the enjoyment of life. This loss of time was a direct result of the Data Breach.

75.   Subsequent to the Data Breach, Plaintiff Richard experienced actual fraud in the form of numerous suspicious telephone calls.

76.   As a result of the Data Breach, Plaintiff Richard has suffered emotional distress as a result of the release of her protected health information which she expected Defendants to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing and potentially using her personal and medical information. Plaintiff Richard further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

77.   Plaintiff Richard suffered actual injury from having her Confidential Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Defendants for its goods and services which she would not have had Defendants disclosed that it lacked data security practices adequate to safeguard patients' Confidential Information from theft; (b) damages to and diminution in the value of her Confidential Information—a form of intangible property that Plaintiff Richard entrusted to Defendants as a condition for healthcare services; (c) loss of her privacy; and (d) lost time.

78.   As a result of the Data Breach, Plaintiff Richard will continue to be at heightened risk for medical fraud, identity theft, and the attendant damages, for years to come.

**Tammie Edwards**

79.   Between 2016 and early 2021, Plaintiff Edwards received services from a Smile Brand affiliate in Stanton, California. In connection with the services that was to be performed by the Smile Brands affiliate, Plaintiff Edwards provided Confidential Information to the affiliate with the expectation that this information would be kept confidential and not disclosed to unauthorized parties.

80.     After she received the Data Breach notification letter, Plaintiff Edwards spent several hours taking action to mitigate the impact of the Data Breach, which included diligently checking her credit monitoring service and/or her financial accounts and consulting with her attorneys. This is time Plaintiff Edwards otherwise would have spent performing other activities or leisurely events for the enjoyment of life.  This loss of time was a direct result of the Data Breach.

81.     As a result of the Data Breach, Plaintiff Edwards has suffered emotional distress as a result of the release of her protected health information which she expected Defendants to protect from disclosure, including anxiety, concern, and unease about unauthorized parties viewing and potentially using her personal and medical information. Plaintiff Edwards further suffers from additional anxiety, concern, and unease about Defendants suffering future data breaches or otherwise disclosing Plaintiff's personal and medical information in the future.

82.     Plaintiff Edwards suffered actual injury from having her Confidential Information exposed as a result of the Data Breach including, but not limited to (a) paying monies to Defendants for its goods and services which she would not have had Defendants disclosed that it lacked data security practices adequate to safeguard patients' Confidential Information from theft; (b) damages to and diminution in the value of her Confidential Information—a form of intangible property that Plaintiff Edwards entrusted to Defendants as a condition for healthcare services; (c) loss of her privacy; (d) lost time; and (e) imminent and impending injury arising from the increased risk of fraud and identity theft.

83.     As a result of the Data Breach, Plaintiff Edwards will continue to be at heightened risk for medical fraud, identity theft, and the attendant damages, for years to come.

84.     As a result of the Data Breach, Plaintiffs and Class members have suffered, and will continue to suffer, economic damages and other actual injury and harm (as detailed above), including, without limitation, the deprivation of the full value of their

Confidential Information, for which there are well-established national and international markets. PII is a unique and valuable property right.[4]

85.    Defendants disregarded the rights of Plaintiffs and Class members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' Confidential Information was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Confidential Information of Plaintiffs and Class members was compromised through unauthorized access by an unknown third party. Plaintiffs and Class members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

**E.    *Defendants Acquire, Collect, and Store Plaintiffs' and Class members' Confidential Information***

86.    Defendants acquired, collected, and stored Plaintiffs' and Class members' Confidential Information.

87.    As a condition of its relationships with Plaintiffs and Class members, including through its affiliates, Defendants required that Plaintiffs and Class members entrust Defendants with highly confidential PII and PHI.

88.    By obtaining, collecting, and storing the Confidential Information of Plaintiffs and Class members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the PII and PHI from disclosure.

---

[4] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 RICH. J.L. & TECH. 11, at *3-*4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

89.     Plaintiffs and Class members have taken reasonable steps to maintain the confidentiality of their PII and PHI and relied on Defendants to keep their PII and PHI confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

90.     Defendants acknowledge that they affirmatively act by obtaining, storing, and transmitting a substantial amount of personal, financial, and medical information from individuals and/or patients. The type of information is detailed in their Privacy Policy,[5] which states that Defendants collect the following categories of personal information and identifiers from individuals and/or patients:

> contact information (such as name, email address, mailing address, phone number), a username and password for our website, IP address (and general location), date of birth, and information in financing applications and patient forms (such as social security number, tax ID number, driver's license number, and signature), and other similar identifying information.

91.     Defendants' Privacy Policy indicates the above personal information is collected by Defendants from individuals such as Plaintiffs and Class members "when [they] apply for financing, contact [Defendants], register and create a profile, use web chats to schedule an appointment, submit patient forms, use [Defendants'] websites, view [Defendants'] advertising or content on other websites (including social media sites), sign up for an email list, or apply for a job. [Defendants] also receive this information from vendors who collect it on [Defendants'] behalf. [Defendants] may receive this information from a patient who lists [them] as an emergency contact or spouse in their pre-visit paperwork or refers [Defendants] to [them], and [Defendants] occasionally purchase mailing lists from other businesses."

92.     Defendants' Privacy Policy states "[t]his Privacy Policy applies to all patients and users of Smile Brands and all of our affiliated practices."

93.     Defendants' Privacy Policy further indicates the purpose of collecting this

---

[5] https://smilebrands.com/terms-conditions/#privacy

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

information is to "operate our business and our website; help you locate an office or practice near you; review credit applications; intake new patients; provide customer service; improve our services; perform research and business analytics; verify requests made pursuant to this Privacy Policy; protect our business and our patients against illegal activity; and to tailor and send you marketing communications for ourselves and for selected third parties. We may use this information for other similar purposes related to the operation of our business, or as we may notify you from time to time."

94.    For Californians, Defendants' Privacy Policy identifies the rights of California residents regarding their personal information pursuant to the California Consumer Privacy Act ("CCPA"). These rights include requesting disclosure of the information collected, the purpose for collecting the information, and any third parties with whom the information is sold or disclosed. Additionally, the rights under the CCPA identified by Defendants' Privacy Policy include requesting deletion of the personal information, and opting out of have personal information sold to third parties.

95.    Defendants promise they "recognize [Plaintiffs' and the Class members'] right to confidentiality and is committed to protecting [their] privacy."[6]

96.    Defendants claim that they "are dedicated to doing our best to protect [Plaintiffs' and the Class members'] personal information."[7]

97.    Defendants warn that "the Internet is not 100% secure, and technology is no substitute for common sense" and encourages users to "keep their login names and passwords secret" and "communicate over secure channels wherever possible, disable the automatic login features found in some browsers, and empty their browser caches regularly."[8]

98.    Defendants' Terms and Conditions expressly references and incorporates Defendants' Privacy Policy.

---

[6] https://smilebrands.com/terms-conditions/#privacy
[7] *Id.*
[8]     *Id.*

1
2
3

### E.      The Healthcare Sector is Particularly Susceptible to Cyberattacks.

4       99.   Defendants were on notice that companies in the healthcare industry were
5   targets for cyberattacks.

6       100.   Defendants were also on notice that the FBI has been concerned about data
7   security in the healthcare industry. In August 2014, after a cyberattack on Community
8   Health Systems, Inc., the FBI warned companies within the healthcare industry that
9   hackers were targeting them. The warning stated that "[t]he FBI has observed malicious
10   actors targeting healthcare related systems, perhaps for the purpose of obtaining the
11   Protected Healthcare Information (PHI) and/or Personally Identifiable Information
12   (PII)."[9]

13       101.   The American Medical Association ("AMA") has also warned healthcare
14   companies about the importance of protecting their patients' confidential information:

15               Cybersecurity is not just a technical issue; it's a patient safety
                issue. AMA research has revealed that 83% of physicians work
16               in a practice that has experienced some kind of cyberattack.
                Unfortunately, practices are learning that cyberattacks not only
17               threaten the privacy and security of patients' health and financial
                information, but also patient access to care.[10]
18
19       102.   The number of U.S. data breaches surpassed 1,000 in 2016, a record high
20   and a forty percent increase in the number of data breaches from the previous year.[11] In

21   _____

22   [9] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, Reuters
    (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-
23   healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820         (last
    visited Sept. 7, 2020).
24   [10] Andis Robezniek, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*,
25   Am.    Med.    Ass'n    (Oct.    4,    2019),    https://www.ama-assn.org/practice-
    management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-
26   hospitals (last visited Sept. 7, 2020).
27   [11] Identity Theft Resource Center, *Data Breaches Increase 40 Percent in 2016, Finds
    New Report From Identity Theft Resource Center and CyberScout* (Jan. 19, 2017),
28   *available at:* https://www.idtheftcenter.org/surveys-studys (last accessed Sept. 18, 2020).

2017, a new record high of 1,579 breaches were reported representing a 44.7 percent increase.[12] That trend continues.

103.   The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[13] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[14] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[15]

104.   Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[16] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards,

---

[12] Identity Theft Resource Center, *2017 Annual Data Breach Year-End Review, available at:* https://www.idtheftcenter.org/2017-data-breaches/ (last accessed Sept. 18, 2020).

[13] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://www.idtheftcenter.org/2018-data-breaches/ (last accessed Sept. 18, 2020).

[14] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 18, 2020).

[15] *Id.*

[16] *2019 HIMSS Cybersecurity Survey, available at*: https://www.himss.org/2019-himms-cybersecurity-survey (last accessed Sept. 18, 2020).

no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[17]

### F.    *Securing PII and PHI and Preventing Breaches*

105.   Defendants could have prevented this Data Breach by properly securing and encrypting the Confidential Information of Plaintiffs and Class members.  Alternatively, Defendants could have destroyed the data, especially decade-old data from former patients of Defendants' affiliated dental groups.

106.   Defendants' negligence in safeguarding the Confidential Information of Plaintiffs and Class members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

107.   Despite the prevalence of public announcements of data breach and data security compromises, especially in the healthcare context, Defendants failed to take appropriate steps to protect the Confidential Information of Plaintiffs and Class members from being compromised.

108.   Prior to the Data Breach, there were many reports of high-profile data breaches that should have put a company like Defendants on high alert and forced it to closely examine its own security procedures, as well as those of third parties with which it did business and gave access to their subscriber PII/PHI.

109.   In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.  Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.  The 525 reported breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.

[17] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, April 4, 2019, *available at*: https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last accessed Sept. 18, 2020).

110.   Defendants were and should have been aware that PII/PHI is at high risk of theft, and consequently should have but did not take appropriate and standard measures to protect Plaintiffs' and Class members' PII/PHI against cyber-security attacks that Defendants should have anticipated and guarded against, including phishing or ransomware.

111.   Over the past years, phishing and ransomware have become the most rampant form of cybercrime and an exponentially increasing threat to organizations such as Defendants. The vast majority of organizations have been targeted by phishing or ransomware. Ransomware, a form of malware designed for the sole purpose of extorting money from victims; and phishing, the delivery mechanism of choice for ransomware and other malware, are critical problems and an evolving threat that every organization must be prepared to face and address.

112.   Companies are increasingly being targeted with phishing attacks. A phishing attack is a method of infiltrating for the purpose of removing data for the purpose of viewing and using it to commit acts such as identity theft and otherwise wrongfully obtaining money or other things of value. Sometimes the person who engaged in phishing uses the data obtained to commit cyber fraud and sometimes the person sells the data to other identity thieves. Either way, the information must be viewed to be of any use or to confirm the contents of the data before being sold.

113.   Phishing is a cybercrime in which a target or targets are contacted by email, telephone or text message by someone posing as a legitimate person or entity so that the recipient provides sensitive data. The hacker cannot do it by him or herself. A phishing incident requires the email system to allow the phishing email to reach the email recipient, for the email recipient to click on a link, provide login credentials, download a file, or take similar affirmative action to allow the hacker to compromise the email recipient's system. The information is then used to access important accounts such as Plaintiffs' and Class members' PII/PHI.

114.   Phishing does not just happen. To be successful, phishing relies on a series of affirmative acts by a company and its employees. This is because computers must be told what to do; they do not make independent decisions. Rather, they rely on instructions and actions from users and programmers. A successful phishing attack also requires an intentional affirmative act on the part of, for example, a company employee, such as clicking a link, downloading a file, or providing sensitive information.   It can reasonably be inferred that such an affirmative act led to the ransomware attack in the Data Breach.

115.   Phishing attempts are extremely common. According to the Anti-Phishing Working Group's ("APWG") Phishing Activity Trends Report for Q2 2020, the first half of the year saw 146,994 reported phishing attacks.[18] Verizon's 2020 Data Breach Investigation Report found that phishing is one of the top data breach threats, with 22 percent of data breaches involving phishing.

116.   Phishing is one way identity thieves, scammers and fraudsters steal information. Comparitech explains the goal of phishing is to trick victims into divulging confidential or personal information that can then be used for fraudulent purposes, like identity theft.[19] The HIPAA Journal explains that phishing attacks on the healthcare industry typically have one of two objectives – to obtain access to PHI or to deliver ransomware. PHI is a valuable commodity on the black market because it can be used to create false identities, obtain free medical treatment, and commit insurance fraud. Thus, the goal of phishing is to obtain and use compromised data so that it may be used to commit fraud.[20]

117.   The APWG describes phishing as a crime employing both social engineering and technical subterfuge to steal personal identity data and account credentials. Social engineering schemes prey on unwary victims by fooling them into believing they are

---

[18] https://docs.apwg.org/reports/apwg_trends_report_q2_2020.pdf
[19] https://www.comparitech.com/blog/information-security/common-phishing-scams-how-to-avoid
[20] https://www.hipaajournal.com/protect-healthcare-data-from-phishing/

dealing with a trusted, legitimate party, such as by using deceptive email addresses and email messages. Phishing schemes are designed to lead victims to counterfeit websites that trick recipients into divulging personal data such as usernames and passwords. Technical subterfuge schemes plant malware onto computers to steal credentials directly, often using systems that intercept victims' account usernames and passwords or misdirect victims to counterfeit websites.

118.  The HIPAA Journal describes that most phishing attacks on the healthcare industry are deployed by email. The communications generally look authentic and instruct employees to follow a link to a web page – where they will be asked to complete some action that will trigger a malware download or enter their username and password to continue. In addition to ransomware, the malware may be in the form of surveillance software such as adware and keystroke loggers that can be downloaded to follow an employee's online activities and record their usernames and passwords. Other types of malicious software can be downloaded to create gateways for hackers to enter an organization's network remotely. If the phishing attempt has been successful in obtaining a username and password, the hacker will likely be able to access PHI almost immediately.[21]

119.  Phishing attacks are successful when a company has not employed adequate security procedures such as (1) training employees on how to recognize and report phishing attacks and conducting mock phishing scenarios; (2) deploying spam filters that can be enabled to recognize and prevent emails from suspicious sources from ever reaching the inbox of employees; (3) keeping all systems current with the latest security patches and updates; (4) installing antivirus solutions and monitoring the antivirus status on all equipment; (5) developing a security policy that includes password expiration and complexity and using two factor authentication to prevent hackers who have compromised a user's credentials from ever gaining access; (6) encrypting all sensitive

---

[21] *Id.*

company information; (7) using only well-configured devices and employing good end point defenses that can stop malware from installing, even if a phishing email is clicked; and (8) implementing policies and procedures for responding quickly to incidents.

120.   By failing to implement these adequate security procedures, Defendants allowed their employees to affirmatively act and negligently left their computer systems open to attack by unauthorized users. Thus, once theses unauthorized users gained access to Defendants' systems through Defendants own acts and omissions, the contents of those systems (including Plaintiffs' and Class members' Confidential Information) were made available by Defendants for the unauthorized person(s) to access, view, acquire and exfiltrate for their nefarious use.

121.   The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[22] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[23]

122.   The ramifications of Defendants' failure to keep secure the PII and PHI of Plaintiffs and Class members are long lasting and severe.  Once PII and PHI is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is an imminent and impending threat of injury that continues for years.

---

[22] 17 C.F.R. § 248.201 (2013).
[23] *Id.*

123.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[24]

124.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

- Implement an awareness and training program.  Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[24] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Nov. 11, 2021).

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.
- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[25]

125.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

---

[25] *Id.* at 3-4.

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[26]

126.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
  - Apply latest security updates
  - Use threat and vulnerability management
  - Perform regular audit; remove privileged credentials
- **Thoroughly investigate and remediate alerts**
  - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
  - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
  - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**
  - Monitor for adversarial activities
  - Hunt for brute force attempts
  - Monitor for cleanup of Event Logs

---

[26] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Nov. 11, 2021).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1    -    Analyze logon events

2    • **Harden infrastructure**

3    -    Use Windows Defender Firewall

4    -    Enable tamper protection

5    -    Enable cloud-delivered protection

6    -    Turn on attack surface reduction rules and [Antimalware Scan

7         Interface] for Office [Visual Basic for Applications].[27]

8    127.    Given that Defendants were storing the Confidential Information of more

9    than 100,000 individuals, Defendants could and should have implemented all of the above

10   measures to prevent and detect ransomware attacks.

11   128.    The occurrence of the Data Breach indicates that Defendants failed to

12   adequately implement one or more of the above measures to prevent ransomware attacks,

13   resulting in Defendants affirmatively exposing and making available the Confidential

14   Information of more than 100,000 individuals, including Plaintiffs and Class members.

15   **G.    *The Value of Confidential Information and the Effects of Unauthorized***

16   ***Disclosure.***

17   129.    At all relevant times, Defendants were well aware that the Confidential

18   Information it collects from Plaintiffs and Class members is highly sensitive and of

19   significant value to those who would use it for wrongful purposes.

20   130.    Confidential Information is a valuable commodity to identity thieves. As the

21   FTC recognizes, identity thieves can use this information to commit an array of crimes

22   including identify theft, and medical and financial fraud.[28] Indeed, a robust "cyber black

23

24

_____

25   [27] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020),
*available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-
26   ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

27   [28] Federal Trade Commission, *Warning Signs of Identity Theft, available at:*
https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last accessed
28   Apr. 21, 2020).

market" exists in which criminals openly post stolen PII and PHI on multiple underground Internet websites, commonly referred to as the dark web.

131. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.[29]

132. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

133. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[30]

134. Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

---

[29] Center for Internet Security, *Data Breaches: In the Healthcare Sector, available at:* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last accessed Apr. 21, 2020).

[30] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last visited Sept. 7 , 2020).

135.   The ramifications of Defendants' failure to keep its patients' Confidential Information secure are long lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

136.   Further, criminals often trade stolen Confidential Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Confidential Information on the internet, thereby making such information publicly available.

137.   Approximately 21% of victims do not realize their identify has been compromised until more than two years after it has happened.[31] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[32]

138.   Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[33] Indeed, when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore

---

[31] *See* Medical ID Theft Checklist, *available at:* https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last accessed Sept. 7, 2020).

[32] Experian, *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), available at:* https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last accesses Sept. 7, 2020).

[33] Identity Theft Resource Center, *2018 End -of-Year Data Breach Report, available at*: https://notified.idtheftcenter.org/s/resource (last accessed Sept.7, 2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

coverage.[34] Almost 50% of the surveyed victims lost their healthcare coverage as a result of the incident, while nearly 30% said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Seventy-four percent said that the effort to resolve the crime and restore their identity was significant or very significant. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[35]

139.   As a healthcare provider, Defendants knew, or should have known, the importance of safeguarding its patients' Confidential Information entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Defendants' patients as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

140.   The compromised Confidential Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways.  Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves.  Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII."[36]  For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional

---

[34] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), *available at:* https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed Sept. 7, 2020); *see also*, National Survey on Medical Identity Theft, Feb. 22, 2010, cited at p. 2.

[35] *Id.*

[36] Fed. Trade Comm'n, Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, Preliminary FTC Staff Report 35-38 (Dec. 2010), *available at*: https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-preliminary-ftc-staff-report-protecting-consumer/101201privacyreport.pdf (as of April 18, 2021).

information about or relating to the individual.[37] Based upon information and belief, the unauthorized parties utilized the Confidential Information they obtained through the Data Breach to obtain additional information of Plaintiffs and Class members that were misused.

141.   Further, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible.  This is known as the "mosaic effect."

142.   Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiffs' and Class members' Confidential Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiffs.

143.   The Confidential Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names.

### H.    *Defendants' Conduct Violates HIPAA.*

144.   HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.[38]

---

[37] *See id.* (evaluating privacy framework for entities collecting or using consumer data with can be "reasonably linked to a specific consumer, computer, or other device").

[38] HIPAA Journal, *What is Considered Protected Health Information Under HIPAA?, available at:* https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/ (last accessed Sept. 7, 2020).

145. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Confidential Information like the data Defendants left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

146. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendants to provide notice of the breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[39]

147. Based on information and belief, Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations. Defendants' security failures include, but are not limited to, the following:

a. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendants create, receive, maintain, store and transmit in violation of 45 C.F.R. §164.306(a)(1);

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

---

[39] Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added) (last visited Sept. 7, 2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, *et seq.*;

i. Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

### I.   *Defendants Failed to Comply with FTC Guidelines*.

148. Defendants were also prohibited by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers'

sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

149.   The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[40]

150.   In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.[41] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

151.   The FTC further recommends that companies not maintain Confidential Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[42]

152.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission

---

[40] Federal Trade Commission, *Start With Security: A Guide for Business*, *available at:* https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Sept. 7, 2020).

[41] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, available at: https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Sept. 7, 2020).

[42] FTC, *Start With Security*, *supra* note 16.

Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

153. Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Confidential Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

154. Defendants were at all times fully aware of its obligation to protect the Confidential Information of patients because of its position as a trusted healthcare provider. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### J.    Defendants Failed to Comply with Healthcare Industry Standards.

155. HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.[43]

156. HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Confidential Information; (b) educating and training healthcare employees on how to protect Confidential Information; and (c) correcting the configuration of software and network devices.

157. Private cybersecurity firms have also identified the healthcare sector as being particularly vulnerable to cyber-attacks, both because the of value of the Confidential Information which they maintain and because as an industry they have been slow to adapt

---

[43] HIPAA Journal, Cybersecurity Best Practices for Healthcare Organizations, https://www.hipaajournal.com/important-cybersecurity-best-practices-for-healthcare-organizations/ (last accessed Sept. 7, 2020).

and respond to cybersecurity threats.[44] They too have promulgated similar best practices for bolstering cybersecurity and protecting against the unauthorized disclosure of Confidential Information.

158. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Defendants chose to ignore them. These best practices were known, or should have been known by Defendants, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Confidential Information.

## K.    *Plaintiffs and Class members Suffered Damages*

159. The ramifications of Defendants' failure to keep patients' Confidential Information secure are long lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.[45]

160. The state of California generally prohibits healthcare providers from disclosing a patient's confidential medical information without prior authorization. California's Confidentiality of Medical Information Act ("CMIA") (Cal. Civ. Code § 56.10(a)) states that "a provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or enrollee or subscriber of a health care service plan without first obtaining an authorization except as provided in subdivision (b) or (c)." (*See also* Cal. Civ. Code §§ 1798.80, *et seq*.)

161. In addition to their obligations under state laws and regulations, Defendants owed a common law duty to Plaintiffs and Class members to protect Confidential

---

[44] *See e.g.,* INFOSEC, *10 Best Practices For Healthcare Security, available at:* https://resources.infosecinstitute.com/category/healthcare-information-security/is-best-practices-for-healthcare/10-best-practices-for-healthcare-security/#gref (last accessed Sept. 7, 2020).

[45] *2014 LexisNexis True Cost of Fraud Study, available at:* https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf (last accessed Sept. 7, 2020).

Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Confidential Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

162.   Defendants further owed and breached its duty to Plaintiffs and Class members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

163.   As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiffs' and Class members' Confidential Information as detailed above, and Plaintiffs are now at a heightened and increased risk of identity theft and fraud.

164.   The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

165.   Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

166.   Plaintiffs and Class members did not receive the full benefit of the bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Defendants and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

167. Plaintiffs' and Class members' Confidential Information has an inherent value, which, as a result of the Data Breach, has diminished, and Defendants improperly received the value of that information by failing to disclose its inadequate data security and allowing unauthorized parties to access, acquire, and view that information.

168. The Confidential Information belonging to Plaintiffs and Class members is private, private in nature, and was left inadequately protected by Defendants who did not obtain Plaintiffs' or Class members' consent to disclose such Confidential Information to any other person as required by applicable law and industry standards.

169. Plaintiffs' and Class members' Confidential Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing, particularly scam marketing which several Plaintiffs have experienced, without the approval of Plaintiffs and Class members. Due to the Data Breach, unauthorized individuals can easily access the Confidential Information of Plaintiffs and Class members.

170. The Data Breach was a direct and proximate result of Defendants' failure to (a) properly safeguard and protect Plaintiffs' and Class members' Confidential Information from unauthorized access, use, viewing, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' Confidential Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

171. Defendants had the resources necessary to prevent the Data Breach, and not only neglected to adequately implement data security measure, but intentionally chose to implement inadequate data security measures, despite its obligation to protect its patients' data.

172. Had Defendants remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have

prevented the intrusions into its systems and, ultimately, the theft of Plaintiffs' and Class members' Confidential Information.

173. As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

174. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, twenty-nine percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[46]

175. Defendants' failure to adequately protect Plaintiffs' and Class members' Confidential Information has resulted in Plaintiffs and Class members having to undertake numerous tasks to protect their information, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendants sit by and do nothing to assist those affected by the incident. Instead, as Defendants' Data Breach notice indicates, it is putting the burden on Plaintiffs and Class members to discover possible fraudulent activity and identity theft.

176. Defendants' offer of either 12 or 24 months of identity monitoring to Plaintiffs and Class members is woefully inadequate. While some harm has begun already, the worst may be yet to come. There may be a time lag between when harm occurs versus when it is discovered, and also between when Confidential Information is acquired and when it is used. Furthermore, identity monitoring only alerts someone to the fact that they have already been the victim of identity theft (*i.e.*, fraudulent acquisition

---

[46] U.S. Department of Justice, Office of Justice Programs Bureau of Justice Statistics, *Victims of Identity Theft, 2012*, December 2013, *available at*: https://www.bjs.gov/content/pub/pdf/vit12.pdf (last accessed Sept. 7, 2020).

and use of another person's Confidential Information) – it does not prevent identity theft.[47] This is especially true for many kinds of medical identity theft, for which most credit monitoring plans provide little or no monitoring or protection.

177.   Plaintiffs and Class members have been damaged in several other ways as well. All Plaintiffs and Class members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Confidential Information. Plaintiffs and Class members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Certain Plaintiffs and Class members have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiffs and Class members also suffered a loss of the inherent value of their Confidential Information.

178.   The Confidential Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Confidential Information to send spear-phishing emails to Class members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

179.   As a result of Defendants' failures to prevent the Data Breach, Plaintiffs and Class members have suffered, will suffer, and are at increased risk of suffering:

---

[47] *See, e.g.*, Kayleigh Kulp, *Credit Monitoring Services May Not Be Worth the Cost*, Nov. 30, 2017, https://www.cnbc.com/2017/11/29/credit-monitoring-services-may-not-be-worth-the-cost.html (last visited Apr. 30, 2020).

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

a.     The compromise, publication, theft and/or unauthorized use of their Confidential Information;

b.     Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c.     Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d.     The continued risk to their Confidential Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake appropriate measures to protect the Confidential Information in their possession;

e.     Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiffs and Class members; and

f.      Anxiety and distress resulting from fear of misuse of their Confidential Information.

180.   In addition to a remedy for the economic harm, Plaintiffs and Class members maintain an undeniable interest in ensuring that their Confidential Information is secure, remains secure, and is not subject to further misappropriation and theft.

**L.     Defendants' Delay in Identifying & Reporting the Breach Caused Additional Harm**

181.   It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the

liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.[48]

182.   Indeed, once a data breach has occurred:

[o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit card bills, insurance invoices, and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).[49]

183.   Although their Confidential Information was improperly exposed and viewed on or about April 25, 2021, Plaintiffs and Class members were not notified of the Data Breach until approximately September 2021, depriving them of the ability to promptly mitigate potential adverse consequences resulting from the Data Breach.

184.   Defendants notified HHS on or about June 24, 2021, but took nearly three months to notify the California Attorney General and more than one more month to inform Plaintiffs and Class members.

185.   As a result of Defendants' delay in detecting and notifying consumers of the Data Breach, the risk of fraud for Plaintiffs and Class members has been driven even higher.

186.   Additionally, Defendants' vague description of the Data Breach leaves Plaintiffs and Class members at continuing risk. By failing to timely and adequately inform Plaintiffs and Class members of the details surrounding the breach Plaintiffs and Class members are unable to adequately protect themselves against the imminent and continued risk of identity theft and other damages.

---

[48] *Identity Fraud Hits Record High with 15.4 Million U.S. Victims in 2016, Up 16 Percent According to New Javelin Strategy & Research Study*, Business Wire¸ *available at:* https://www.businesswire.com/news/home/20170201005166/en/Identity-Fraud-Hits-Record-High-15.4-Million (last accessed Sept. 7, 2020).

[49] Consumer Reports, *The Data Breach Next Door Security breaches don't just hit giants like Equifax and Marriott. Breaches at small companies put consumers at risk, too*, January 31, 2019, *available at:* https://www.consumerreports.org/data-theft/the-data-breach-next-door/ (last accessed Sept. 7, 2020).

# V.   CHOICE OF LAW

187.   The State of California has a significant interest in regulating the conduct of businesses operating within its borders. California seeks to protect the rights and interests of all California residents and citizens of the United States against a company headquartered and doing business in California. California has a greater interest in the nationwide claims of Plaintiffs and members of the Nationwide Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

188.   The corporate headquarters of Smile Brands, located in Orange County, California, is the "nerve center" of their business activities – the place where their officers direct, control, and coordinate the companies' activities, including their data security functions and policy, financial, and legal decisions.

189.   Based on information and belief, Smile Brands' response to the Data Breach at issue here, and corporate decisions surrounding such response, were made from and in California.

190.   Based on information and belief, Smile Brands' breaches of duty to Plaintiffs and Nationwide Class members emanated from California.

191.   Application of California law to the Nationwide Class with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because California has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Class.

192.   Under California's choice of law principles, which are applicable to this action, the common law of California applies to the nationwide common law claims of all Nationwide Class members. Additionally, given California's significant interest in regulating the conduct of businesses operating within its borders, California's Unfair Competition Law, Confidentiality of Medical Information Act, and California Consumer Privacy Act of 2018 may be applied to non-resident plaintiffs as against Defendants.

# VI.    CLASS ALLEGATIONS

193.    Plaintiffs bring this class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

194.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> **Nationwide Class: All individuals whose Confidential Information was compromised in the Data Breach announced by Defendants that occurred on or about April 24, 2021.**

195.    In addition to the Nationwide Class, Plaintiffs seek to represent and request certification of the following state Sub-Class:

> **California Sub-Class: All persons residing in California whose Confidential Information was compromised in the Data Breach announced by Defendants that occurred on or about April 24, 2021.**

196.    Excluded from the Classes are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

197.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

198.    <u>Numerosity</u>, Fed. R. Civ. P. 23(a)(1): The Nationwide Class and state Sub-Class (the "Classes") are so numerous that joinder of all members is impracticable. According to Defendants, over 2.5 million persons'[50] Confidential Information may have

---

[50] *See* Data Breach information reported by Defendants to the Office of the Maine Attorney General stating the "Total number of persons affected (including [Maine]

been improperly accessed in the Data Breach, and the Classes are apparently identifiable within Defendants' records.

199.   <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class members. These include:

       a.    Whether and when Defendants actually learned of the Data Breach and whether their response was adequate;

       b.    Whether Defendants owed a duty to the Classes to exercise due care in collecting, storing, safeguarding and/or obtaining their Confidential Information;

       c.    Whether Defendants breached that duty;

       d.    Whether Defendants implemented and maintained reasonable security procedures and practices appropriate to the nature of storing Plaintiffs' and Class members' Confidential Information;

       e.    Whether Defendants acted negligently in connection with the monitoring and/or protecting of Plaintiffs' and Class members' PII/PHI;

       f.    Whether Defendants knew or should have known that they did not employ reasonable measures to keep Plaintiffs' and Class members' PII/PHI secure and prevent loss or misuse of that Confidential Information;

       g.    Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

       h.    Whether Defendants caused Plaintiffs' and Class members' damages;

       i.    Whether Defendants violated the law by failing to promptly notify Class members that their Confidential Information had been

residents): 2592494": https://apps.web.maine.gov/online/aeviewer/ME/40/1091bb04-e683-4b60-8681-8a25ac427aa3.shtml (last accessed April 25, 2022).

1   compromised;

2   j.    Whether Plaintiffs and the other Class members are entitled to actual

3   damages, credit monitoring, and other monetary relief;

4   k.    Whether Defendants violated the California Unfair Competition Law

5   (Business & Professions Code § 17200, *et seq*.); and

6   l.    Whether Defendants violated the Confidentiality of Medical

7   Information Act (Cal. Civ. Code § 56, *et seq*.).

8   200.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of

9   other Class members because all had their Confidential Information compromised as a

10  result of the Data Breach, due to Defendants' misfeasance.

11  201.  <u>Policies Generally Applicable to the Class</u>: This class action is also

12  appropriate for certification because Defendants have acted or refused to act on grounds

13  generally applicable to the Class, thereby requiring the Court's imposition of uniform

14  relief to ensure compatible standards of conduct toward the Class members, and making

15  final injunctive relief appropriate with respect to the Class as a whole. Defendants'

16  policies challenged herein apply to and affect Class members uniformly and Plaintiffs'

17  challenge of these policies hinges on Defendants' conduct with respect to the Class as a

18  whole, not on facts or law applicable only to Plaintiff.

19  202.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately

20  represent and protect the interests of the Class members in that they have no disabling

21  conflicts of interest that would be antagonistic to those of the other Members of the Class.

22  Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and

23  the infringement of the rights and the damages they have suffered are typical of other

24  Class members. Plaintiffs have retained counsel experienced in complex consumer class

25  action litigation, and Plaintiffs intend to prosecute this action vigorously.

26  203.  <u>Superiority and Manageability</u>, Fed. R. Civ. P. 23(b)(3): The class litigation

27  is an appropriate method for fair and efficient adjudication of the claims involved. Class

28  action treatment is superior to all other available methods for the fair and efficient

adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

204.   The nature of this action and the nature of laws available to Plaintiffs and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

205.   Smile Brands is based in Orange County, California, and on information and belief, all managerial decisions emanate from there, the representations on Smile Brands' website originate from there, Smile Brands' misrepresentations originated from California, and therefore application of California law to the Nationwide Class is appropriate.

206.   The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

207.   Adequate notice can be given to Class members directly using information maintained in Defendants' records.

208.   Unless a Class-wide injunction is issued, Plaintiffs and Class members remain at risk that Defendants will continue to fail to properly secure the Confidential Information of Plaintiffs and Class members resulting in another data breach, continue to refuse to provide proper notification to Class members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

209.   Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

210.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

        a.    Whether Defendants owed a legal duty to Plaintiffs and Class members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

        b.    Whether Defendants breached a legal duty to Plaintiffs and Class members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

        c.    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

        d.    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

        e.    Whether Class members are entitled to actual damages, credit

1    monitoring or other injunctive relief, and/or punitive damages as a

2    result of Defendants' wrongful conduct.

3                            **CAUSES OF ACTION**

4                                 **COUNT I**
5    **VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL
     INFORMATION ACT,**
     **CAL. CIV. CODE §§ 56, *ET SEQ*. ("CMIA")**
6
7    **(On Behalf of Plaintiffs and the Classes, or, alternatively, the California Sub-Class)**

8        211.   Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set

9    forth herein.

10       212.   At all relevant times, Defendants were health care providers because they

11   had the "purpose of maintaining medical information to make the information available

12   to an individual or to a provider of health care at the request of the individual or a provider

13   of health care, for purposes of allowing the individual to manage his or her information,

14   or for the diagnosis or treatment of the individual."

15       213.   Defendants are providers of healthcare within the meaning of Civil Code §

16   56.06(a) and maintains medical information as defined by Civil Code § 56.05.

17       214.   Plaintiffs and Class members are patients of Defendants, as defined in Civil

18   Code § 56.05(k).

19       215.   Plaintiffs and Class members provided their personal medical information to

20   Defendants.

21       216.   At all relevant times, Defendants collected, stored, managed, and transmitted

22   Plaintiffs' and Class members' personal medical information.

23       217.   As a provider of health care or a contractor, Defendants are required by the

24   CMIA to ensure that medical information regarding patients is not disclosed or

25   disseminated or released without patients' authorization, and to protect and preserve the

26   confidentiality of the medical information regarding a patient, under Civil Code §§ 56.06,

27   56.10, 56.13, 56.20, 56.245, 56.26, 56.35, 56.36, and 56.101.

28       218.   As a provider of health care or a contractor, Defendants are required by the

                                          55

CMIA not to disclose medical information regarding a patient without first obtaining an authorization under Civil Code §§ 56.06, 56.10, 56.13, 56.20, 56.245, 56.26, 56.35 and 56.104.

219.   As a provider of health care or a contractor, Defendants are required by the CMIA to create, maintain, preserve, and store medical records in a manner that preserves the confidentiality of the information contained therein under Civil Code §§ 56.06 and 56.101(a).

220.   As a provider of health care or a contractor, Defendants are required by the CMIA to protect and preserve confidentiality of electronic medical information of Plaintiffs and the Class in its possession under Civil Code §§ 56.06 and 56.101(b)(1)(A).

221.   As a provider of health care or a contractor, Defendants are required by the CMIA to take appropriate preventive actions to protect the confidential information or records against release consistent with Defendants' obligations under the CMIA, under Civil Code § 56.36I(2)(E).

222.   Section 56.10(a) of the California Civil Code provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

223.   As a result of the Data Breach, Defendants have misused, disclosed, and/or allowed third parties to access and view Plaintiffs' and Class members' personal medical information without their written authorization compliant with the provisions of Civil Code §§ 56, *et seq*.

224.   The hacker or hackers who committed the Data Breach obtained Plaintiffs' and Class members' personal medical information, viewed it, and now have it available to them to sell to others bad actors or otherwise misuse.

225.   As a further result of the Data Breach, the confidential nature of the Plaintiffs' medical information was breached as a result of Defendants' negligence. Specifically, Defendants knowingly allowed and affirmatively engaged in conduct that

allowed unauthorized parties to access and view Plaintiff's and Class members' Confidential Information, which was acquired, viewed, and used when the unauthorized parties engaged in the above-described fraudulent activity.

226.   Defendants' misuse and/or disclosure of medical information regarding Plaintiffs and Class members constitutes a violation of Civil Code §§ 56.10, 56.11, 56.13, and 56.26.

227.   As a direct and proximate result of Defendants' wrongful and affirmative actions, inaction, omissions, and want of ordinary care, Plaintiffs' and Class members' personal medical information was disclosed without written authorization.

228.   By affirmatively disclosing Plaintiffs' and Class members' Confidential Information without their written authorization, Defendants violated California Civil Code § 56, *et seq*., and their legal duty to protect the confidentiality of such information.

229.   Defendants also violated Sections 56.06 and 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information.

230.   As a direct and proximate result of Defendants' wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs' and Class members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiffs' and Class members' written authorization.

231.   Defendants' negligent failure to maintain, preserve, store, abandon, destroy, and/or dispose of Plaintiffs and Class members' medical information in a manner that preserved the confidentiality of the information contained therein violated the CMIA, Cal. Civ. Code §§ 56.06 and 56.101(a). By Defendants' own admission, patients' confidential medical information contained in unencrypted emails and attachments has been accessed and viewed by an unauthorized third party or parties, and thus Defendants have negligently released medical information concerning Plaintiffs and Class members. Accordingly, Defendants' systems and protocols did not protect and preserve the integrity

of electronic medical information in violation of the CMIA, Cal. Civ. Code § 56.101.

232.   As a direct and proximate result of Defendants' and/or its employees' above-described conduct in violation of the CMIA, Plaintiffs and Class members were injured and have suffered damages, as described above, from Defendants' illegal disclosure and/or negligent release of their medical information in violation of Cal. Civ. Code §§ 56.10 and 56.101, and are therefore entitled to nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1); the amount of actual damages, if any, for each violation under Civil Code §56.36(b)(2); injunctive relief; and attorneys' fees, expenses, and costs.

## COUNT II
## NEGLIGENCE

### (On Behalf of Plaintiffs and the Classes)

233.   Plaintiffs restate and realleges all of the foregoing Paragraphs as if fully set forth herein.

234.   As a condition of receiving services, Plaintiffs and Class members were obligated to provide Defendants directly, or through their affiliates, with their Confidential Information.

235.   Plaintiffs and Class members entrusted their Confidential Information to Defendants with the understanding that Defendants would safeguard their information.

236.   Defendants had full knowledge of the sensitivity of the Confidential Information and the types of harm that Plaintiffs and Class members could and would suffer if the Confidential Information were wrongfully disclosed.

237.   Defendants had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining and testing its security protocols to ensure that Confidential Information in its possession was adequately secured and protected and that employees tasked with maintaining such information were adequately training on relevant cybersecurity measures.

238.   Plaintiffs and Class members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendants knew of or should have known of the inherent risks in collecting and storing the Confidential Information of Plaintiffs and Class members, the critical importance of providing adequate security of that Confidential Information, the current cyber scams being perpetrated, and that they had inadequate employee training and education and IT security protocols in place to secure the Confidential Information of Plaintiffs and Class members.

239.   Defendants' own conduct created a foreseeable risk of harm to Plaintiffs and Class members. Defendants' misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendants' misconduct also included their decision not to comply with HIPAA and industry standards for the safekeeping and encrypted authorized disclosure of the Confidential Information of Plaintiffs and Class members.

240.   Plaintiffs and Class members had no ability to protect their Confidential Information that was in Defendants' possession.

241.   Defendants were in a position to protect against the harm suffered by Plaintiffs and Class members as a result of the Data Breach.

242.   Defendants had a duty to put proper procedures in place to prevent the unauthorized dissemination of Plaintiffs' and Class members' Confidential Information.

243.   Defendants have admitted that Plaintiffs' and Class members' Confidential Information was wrongfully disclosed to unauthorized third persons as a result of the Data Breach.

244.   Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class members' Confidential Information while it was within Defendants' possession or control.

245.   Defendants improperly and inadequately safeguarded Plaintiffs' and Class members' Confidential Information in deviation of standard industry rules, regulations and practices at the time of the Data Breach.

246.   Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiffs and Class members by failing to have appropriate procedures in place to detect and prevent dissemination of its Plaintiffs' and Class members' Confidential Information.

247.   Defendants, through their actions and/or omissions, unlawfully breached their duty to adequately disclose to Plaintiffs and Class members the existence and scope of the Data Breach.

248.   But for Defendants' wrongful and negligent breach of duties owed to Plaintiffs and Class members, Plaintiffs' and Class members' Confidential Information would not have been compromised and/or subsequently misused by unauthorized third parties to engage in fraudulent activity further harming Plaintiffs and Class members.

249.   There is a temporal and close causal connection between Defendants' failure to implement security measures to protect the Confidential Information and the harm suffered, or risk of imminent harm suffered, by Plaintiffs and the Class.

250.   As a result of Defendants' negligence, unauthorized parties acquired Plaintiffs' Confidential Information and used that specific information to harm Plaintiffs and Class members as described above.  As a further result of Defendants' negligence, Plaintiffs and Class members have suffered and will continue to suffer damages and injury including, but not limited to, (a) actual identity theft; (b) an increased risk of identity theft, fraud, and/or misuse of their Confidential Information; (c) the loss of the opportunity of how their Confidential Information is used; (d) the compromise, publication, and/or theft of their Confidential Information; (e) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Confidential Information; (f) diminished value of the Confidential Information; (g) lost opportunity costs associated with efforts expended and the loss of productivity addressing

and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (h) the continued risk to their Confidential Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Confidential Information in their continued possession; and (i) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Confidential Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class members.

251.   Violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

252.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Confidential Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

253.   Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class members' Confidential Information and not complying with applicable industry standards, as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of Confidential Information they obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class members.

254.   Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

255.   Plaintiffs and Class members are within the class of persons that the FTC Act was intended to protect.

256.   The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class members.

257.   Defendants' violation of HIPAA also independently constitutes negligence *per se*.

258.   HIPAA privacy laws were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

259.   Plaintiffs and Class members are within the class of persons that HIPAA privacy laws were intended to protect.

260.   The harm that occurred as a result of the Data Breach is the type of harm HIPAA privacy laws were intended to guard against.

261.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered, and continue to suffer, injuries and damages arising from the Data Breach including, but not limited to an increased risk of identity theft, fraud, and/or misuse of their Confidential Information and damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial and medical accounts, closely reviewing and monitoring their credit reports and various accounts for unauthorized activity, filing police reports, and damages from identity theft, which may take months if not years to discover and detect.

262.   Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their Confidential Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Confidential Information in its continued possession.

**COUNT III**
**BREACH OF CONTRACT**

**(On Behalf of Plaintiffs and the Classes)**

263.   Plaintiffs restate and realleges all of the foregoing Paragraphs as if fully set forth

264.   Plaintiffs and other Class members entered into valid and enforceable express contracts with Defendants under which Plaintiffs and other Class members agreed to provide their Confidential Information to Defendants, and Defendants agreed to their services for monetary compensation and, impliedly if not explicitly, agreed to protect Plaintiffs' and other Class members' Confidential Information.

265.   These contracts include, but are not limited to, test requisition forms, patient signature cards, HIPAA authorization forms, patient consent forms, and the Terms of Use and Privacy Policy that included Defendants' promise to protect nonpublic personal information given to Defendants or that Defendants gathered on their own, from disclosure, as set forth in Defendants' Privacy Policy, which was posted on its website.

266.   Plaintiffs and Class members performed their obligations under the contracts when they provided their PII/PHI to Defendants in relation to their services and/or employment with Defendants.

267.   To the extent Defendants' obligation to protect Plaintiffs' and other Class members' Confidential Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendants to implement data security adequate to safeguard and protect the confidentiality of Plaintiffs' and other Class members' Confidential Information, including in accordance with HIPAA regulations;

federal, state and local laws; and industry standards. No Plaintiff would have entered into these contracts with Defendants without understanding that Plaintiffs' and other Class members' Confidential Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

268.   A meeting of the minds occurred, as Plaintiffs and other Class members agreed, among other things, to provide their Confidential Information to Defendants for which Defendants derive a monetary benefit, in exchange for Defendants' agreement to protect the confidentiality of that Confidential Information.

269.   Both the provision of Defendants' services and the protection of Plaintiffs' and other Class members' Confidential Information were material aspects of Plaintiffs' and other Class members' contracts with Defendants.

270.  Defendants' promises and representations described above relating to HIPAA, CMIA, and industry practices, and about Defendants' purported concern about their patients' privacy rights became terms of the contracts between Defendants and their patients, including Plaintiffs and other Class members. Defendants breached these promises by failing to comply with HIPAA, CMIA, and reasonable industry practices, and by allowing unauthorized users to gain access to Plaintiffs' and Class members' PII/PHI through the Data Breach.

271.   Plaintiffs and Class members read, reviewed, and/or relied on statements made by or provided by Defendants and/or otherwise understood that Defendants would protect its patients' Confidential Information if that information were provided to Defendants.

272.   As a result of Defendants' breach of these terms, Plaintiffs and other Class members have suffered a variety of damages including but not limited to: the invasion value of their privacy; they did not get the benefit of their bargain with Defendants; they lost the difference in the value of the secure health services Defendants promised and the insecure services received; the value of the lost time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that

required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiffs and other Class members have been put at increased risk of future identity theft, fraud, and/or misuse of their Confidential Information, which may take months if not years to manifest, discover, and detect.

273.   Plaintiffs and Class members are therefore entitled to damages, including restitution and unjust enrichment, disgorgement, declaratory and injunctive relief, and attorney fees, costs, and expenses.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**

**(On Behalf of Plaintiffs and the Classes, in the Alternative to Count III)**

274.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

275.   Plaintiffs and Class members were required to provide their Confidential Information to Defendants as a condition of their use of Defendants' services.  By providing their Confidential Information, and upon Defendants' acceptance of such information, Plaintiffs and all Class members, on one hand, and Defendants, on the other hand, entered into implied-in-fact contracts for the provision of data security, separate and apart from any express contracts concerning Defendants' services to be provided by Defendants to Plaintiffs.

276.   To the extent Defendants' obligation to protect Plaintiffs' and other Class members' Confidential Information was not explicit in those express contracts, the express contracts included implied terms requiring Defendants to implement data security adequate to safeguard and protect the confidentiality of Plaintiffs' and other Class members' Confidential Information, including in accordance with HIPAA regulations; federal, state and local laws; and industry standards. No Plaintiff would have entered into these contracts with Defendants without understanding that Plaintiffs' and other Class

65
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

members' Confidential Information would be safeguarded and protected; stated otherwise, data security was an essential implied term of the parties' express contracts.

277.    These implied-in-fact contracts obligated Defendants to take reasonable steps to secure and safeguard Plaintiffs' and other Class members' Confidential Information. The terms of these implied contracts are further described in the federal laws, state laws, and industry standards alleged above, and Defendants expressly assented to these terms in their Notice of Privacy Practices and other public statements described above.

278.    Plaintiffs and Class members paid money, or money was paid on their behalf, to Defendants in exchange for services, along with Defendants' promise to protect their health information and other Confidential Information from unauthorized disclosure.

279.    In their written privacy policies, Defendants expressly promised Plaintiffs and Class members that it would only disclose Confidential Information under certain circumstances, none of which relate to the Data Breach.

280.    Defendants promised to comply with HIPAA standards and to make sure that Plaintiffs' and Class members' Confidential Information would remain protected.

281.    Implicit in the agreement between Plaintiffs and Class members and the Defendants to provide Confidential Information was Defendants' obligation to (a) use such Confidential Information for business purposes only; (b) take reasonable steps to safeguard that Confidential Information; (c) prevent unauthorized disclosures of the Confidential Information; (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Confidential Information; (e) reasonably safeguard and protect the Confidential Information of Plaintiffs and Class members from unauthorized disclosure or uses; and (f) retain the Confidential Information only under conditions that kept such information secure and confidential.

282.    Without such implied contracts, Plaintiffs and Class members would not have provided their Confidential Information to Defendants.

283.  Plaintiffs and Class members fully performed their obligations under the implied contract with Defendants; however, Defendants did not.

284.  Defendants breached the implied contracts with Plaintiffs and Class members by failing to conduct the following:

a.  reasonably safeguard and protect Plaintiffs' and Class members' Confidential Information, which was compromised as a result of the Data Breach;

b.  comply with their promise to abide by HIPAA;

c.  ensure the confidentiality and integrity of electronic protected health information that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R 164.306(a)(1);

d.  implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R 164.312(a)(1);

e.  implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R 164.308(a)(1);

f.  identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R 164.308(a)(6)(ii); and

g.  protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R 164.306(a)(2).

285.  As a direct and proximate result of Defendants' breach of the implied contracts, Plaintiffs and other Class members have suffered a variety of damages including but not limited to: the lost value of their privacy; they did not get the benefit of their bargain with Defendants; they lost the difference in the value of the secure health services Defendants promised and the insecure services received; the value of the lost

time and effort required to mitigate the actual and potential impact of the Data Breach on their lives, including, *inter alia*, that required to place "freezes" and "alerts" with credit reporting agencies, to contact financial institutions, to close or modify financial and medical accounts, to closely review and monitor credit reports and various accounts for unauthorized activity, and to file police reports; and Plaintiffs and other Class members have been put at an increased risk of identity theft, fraud, and/or misuse of their Confidential Information, which may take months if not years to manifest, discover, and detect.

**COUNT VI**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW,**
**CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*. ("UCL")**

**(On Behalf of Plaintiffs and the Classes, or, alternatively, the California Sub-Class)**

286.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

287.   The California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200, *et seq*. ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

288.   By reason of Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiffs and Class members' Confidential Information, Defendants engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

289.   Defendants have violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services provided to the Nationwide Class.

290.   Defendants' business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous,

and substantially injurious to consumers, in that the Confidential Information of Plaintiffs and Class members has been compromised for unauthorized parties to see, use, and otherwise exploit.

291.   In the course of conducting its business, Defendants committed "unlawful" business practices by, *inter alia*, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiffs and Class members' PII/PHI, and by violating the statutory and common law alleged herein, including, *inter alia*, California's Confidentiality of Medical Information Act (Civ. Code §§ 56.10(a), (e); 56.101(a), 56.101(b)(1)(A); 56.36), the California Consumer Privacy Act of 2018 (Cal. Civ. Code § 1798.150(a)(1)), the Health Insurance Portability and Accountability Act of 1996, (42 U.S.C. § 1302d; 45 C.F.R. §§ 164.306(a), (d), (e); 164.308(a); 164.312(a), (d), (e); 164.316(a), (b)),   Civil Code § 1798.81.5, and Article I, Section 1 of the California Constitution (California's constitutional right to privacy). Plaintiffs and Class members reserve the right to allege other violations of law by Defendants constituting other unlawful business acts or practices. Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care are ongoing and continue to this date.

292.   Defendants also violated the UCL's unlawful prong by breaching contractual obligations created by its Privacy Policy and by knowingly and willfully or, in the alternative, negligently and materially violating Cal. Bus. & Prof. Code § 22576, which prohibits a commercial website operator from "knowingly and willfully" or "negligently and materially" failing to comply with the provisions of their posted privacy policy. Plaintiffs and Class members suffered injury in fact, invasion of privacy, and lost money or property as a result of Defendants' violations of its Privacy Policy.

293.   Defendants also violated the UCL by failing to adequately and timely notify Plaintiffs and Class members pursuant to Civil Code § 1798.82(a) regarding the unauthorized access and disclosure of their PII/PHI. If Plaintiffs and Class members had

been adequately and timely notified in an appropriate fashion, they could have taken precautions to safeguard and protect their PII/PHI and identities.

294.   Defendants' above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiffs' and Class members' Confidential Information also constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200, *et seq*., in that Defendants' conduct was substantially injurious to Plaintiffs and Class members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct.

295.   Defendants engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class members' Confidential Information with knowledge that the information would not be adequately protected; by violating the California Confidentiality Of Medical Information Act, Cal. Civ. Code § 56, *et seq*.; by violating the other statutes described above; and by storing Plaintiffs' and Class members' Confidential Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendants to take reasonable methods of safeguarding the Confidential Information of Plaintiffs and the Class members.

296.   Defendants' practices were also unlawful and in violation of Civil Code sections 1798, *et seq*. and Defendants' own privacy policy because Defendants failed to take reasonable measures to protect Plaintiffs' and Class members' Confidential Information and failed to take remedial measures such as notifying its users when it first discovered that their Confidential Information may have been compromised.

297.   In addition, Defendants engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).

298.   Defendants' above-described wrongful actions, inaction, omissions, want of ordinary care, misrepresentations, practices, and non-disclosures also constitute "unfair" business acts and practices in violation of the UCL in that Defendants' wrongful conduct is substantially injurious to consumers, offends legislatively-declared public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendants' practices are also contrary to legislatively declared and public policies that seek to protect PII/PHI and ensure that entities who solicit or are entrusted with personal data utilize appropriate security measures, as reflected by laws such as the CCPA, Article I, Section 1 of the California Constitution, and the FTC Act (15 U.S.C. § 45). The gravity of Defendants' wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendants' legitimate business interests other than engaging in the above-described wrongful conduct.

299.   Defendants' business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the Confidential Information they provided to Defendants will remain private and secure, when in fact it has not been maintained in a private and secure manner, and that Defendants would take proper measures to investigate and remediate a data breach, when Defendants did not do so.

300.   Plaintiffs and Class members suffered (and continue to suffer) injury in fact, invasion of privacy, and lost money or property as a direct and proximate result of Defendants' above-described wrongful actions, inaction, and omissions including, *inter alia*, the unauthorized release and disclosure of their Confidential Information and lack of notice.

301.   But for Defendants' misrepresentations and omissions, Plaintiffs and Class members would not have provided their Confidential Information to Defendants, or would have insisted that their Confidential Information be more securely protected.

302.   As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violations of the UCL, Plaintiffs and Class members

have suffered injury in fact, invasion of privacy, and lost money or property as a result of Defendants' unfair and deceptive conduct. Such injury includes paying for a certain level of security for their PII/PHI but receiving a lower level, paying more for Defendants' products and services than they otherwise would have had they known Defendants were not providing the reasonable security represented in its Privacy Policy and as in conformance with its legal obligations. Defendants' security practices have economic value in that reasonable security practices reduce the risk of theft of PII/PHI collected, maintained, and stored by Defendants.

303. Plaintiffs and Class members have also suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (i) an imminent, immediate and the continuing increased risk of identity theft and identity fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) deprivation of the value of their PII/PHI for which there is a well-established national and international market, and/or (v) the financial and temporal cost of monitoring their credit, monitoring financial accounts, and mitigating damages.

304. Defendants knew or should have known that Defendants' computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class members' Confidential Information and that the risk of a data breach or theft was highly likely. Defendants' actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class members.

305. Plaintiffs seek prospective injunctive relief, including improvements to Defendants' data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Private Information that remains in Defendants' custody, including but not limited to the following:

a. Ordering that Defendants engage third-party security auditors/penetration testers as well as internal security personnel to

conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

e. Ordering that Defendants not transmit Private Information via unencrypted email;

f. Ordering that Defendants not store Private Information in email accounts;

g. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendants' services;

h. Ordering that Defendants conduct regular computer system scanning and security checks;

i. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j. Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

306.   Unless such Class-wide injunctive relief is issued, Defendants will continue to engage in the above-described wrongful conduct, more data breaches will occur, and Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on Defendants' representations regarding its data security in the future.

307.   Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code § 17200, *et seq.*, including, but not limited to, restitution to Plaintiffs and Class members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

## COUNT VII
## INVASION OF PRIVACY

### (On Behalf of Plaintiffs and the Classes)

308.   Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

309.   California established the right to privacy in Article 1, Section 1 of the California Constitution.

310.   The State of California recognizes the tort of Intrusion into Private Affairs, and adopts the formulation of that tort found in the Restatement (Second) of Torts which states:

311.   One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1977).

312.   Plaintiffs and Class members had a legitimate and reasonable expectation of privacy with respect to their Confidential Information and were accordingly entitled to

74

the protection of this information against disclosure to unauthorized third parties.

313.   Defendants owed a duty to patients in their network, including Plaintiffs and Class members, to keep their Confidential Information confidential.

314.   The unauthorized release of Confidential Information, especially the type related to personal health information, is highly offensive to a reasonable person.

315.   The intrusion was into a place or thing, which was private and is entitled to be private. Plaintiffs and Class members disclosed their Confidential Information to Defendants as part of their use of Defendants' services, but privately, with the intention that the Confidential Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

316.   The Data Breach constitutes an intentional interference with Plaintiffs' and Class members' interest in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

317.   Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew its information security practices were inadequate and would likely result in a data breach such as the one that harmed Plaintiffs and Class members.

318.   Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and Class members.

319.   As a proximate result of Defendants' acts and omissions, Plaintiffs' and Class members' Confidential Information was disclosed to and used by third parties without authorization in the manner described above, causing Plaintiffs and Class members to suffer damages.

320.   Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class members in that the Confidential Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons.

321.   Plaintiffs and Class members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class members.

**COUNT VII**
**VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**CAL. CIV. CODE § 1750, *ET SEQ.* ("CLRA")**

**(On Behalf of Plaintiffs and the Classes, or, alternatively, the California Sub-Class)**

322.   Plaintiffs restate and reallege all the foregoing paragraphs as if fully set forth herein.

323.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq*.

324.   Defendants have long had notice of Plaintiffs' allegations, claims and demands, including from the filing of numerous underlying actions against it arising from the Data Breach, the first of which were filed on or about November 16, 2021. Further, Defendants are the parties with the most knowledge of the underlying facts giving rise to Plaintiffs' allegations, so that any pre-suit notice would not put Defendants in a better position to evaluate those claims. Similarly, Plaintiffs Ponce and Warren provided Defendants with written notice of their violations of the CCPA on November 18, 2021, which put Defendants on notice of the remedies it must correct. To the extent additional notice is required, Plaintiffs will issue separate demands under Cal. Civ. Code § 1782(a). Plaintiffs in the alternative seek only injunctive relief pursuant to Cal. Civ. Code § 1782, subdivision (d), which provides that "[a]n action for injunctive relief brought under the specific provisions of Section 1770 may be commenced without compliance with subdivision (a)."  Moreover, it has now been more than 30 days since Plaintiffs filed the Consolidated Class Action Complaint (filed March 3, 2022), which contained adequate notice of Plaintiffs' CLRA claim.

325.   Plaintiffs and Class members are "consumers," as the term is defined by California Civil Code § 1761(d).

326.   Plaintiffs, Class members, and Defendants have engaged in "transactions,"

as that term is defined by California Civil Code § 1761(e).

327.   The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendants was likely to deceive consumers.

328.   Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

329.   Defendants violated this provision by representing that it took appropriate measures to protect Plaintiffs' and the Class members' Confidential Information. Additionally, Defendants improperly handled, stored, or protected either unencrypted or partially encrypted data.

330.   Plaintiffs and the Class members relied upon Defendants' representations and were induced to sign up for Defendants' services, and provide their Confidential Information which contains value in order to obtain services from Defendants.

331.   As a result, Plaintiffs and Class members were induced to enter into a relationship with Defendants and provide their Confidential Information.

332.   As a result of engaging in such conduct, Defendants have violated Civil Code § 1770.

333.   Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiffs seek an order of this Court that includes, but is not limited to, an order enjoining Defendants from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

334.   Plaintiffs and Class members suffered injuries caused by Defendants' misrepresentations, because they provided their Confidential Information believing that Defendants would adequately protect this information.

335.   Plaintiffs and Class members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

336.   The unfair and deceptive acts and practices of Defendants, as described

1  above, present a serious threat to Plaintiffs and Class members.

2      337.   Plaintiffs seek prospective injunctive relief, including improvements to

3  Defendants' data security systems and practices, in order to ensure that such security is

4  reasonably sufficient to safeguard patients' Private Information that remains in

5  Defendants' custody, including but not limited to the following:

6      a.  Ordering      that     Defendants      engage      third-party      security

7          auditors/penetration testers as well as internal security personnel to

8          conduct testing, including simulated attacks, penetration tests, and audits

9          on Defendants' systems on a periodic basis, and ordering Defendants to

10         promptly correct any problems or issues detected by such third-party

11         security auditors;

12     b.  Ordering that Defendants engage third-party security auditors and

13         internal personnel to run automated security monitoring;

14     c.  Ordering that Defendants audit, test, and train their security personnel

15         regarding any new or modified procedures;

16     d.  Ordering that Defendants segment patient data by, among other things,

17         creating firewalls and access controls so that if one area of Defendants'

18         systems is compromised, hackers cannot gain access to other portions of

19         Defendants' systems;

20     e.  Ordering    that    Defendants    not    transmit    Private    Information    via

21         unencrypted email;

22     f.  Ordering that Defendants not store Private Information in email accounts;

23     g.  Ordering that Defendants purge, delete, and destroy in a reasonably

24         secure manner patient data not necessary for provisions of Defendants'

25         services;

26     h.  Ordering that Defendants conduct regular computer system scanning and

27         security checks;

28     i.  Ordering    that    Defendants    routinely    and    continually    conduct    internal

training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j.  Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps they must take to protect themselves.

338.  Unless such Class-wide injunctive relief is issued, Plaintiffs and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiffs (and other consumers) can rely on Defendants' representations regarding its data security in the future.

339.  Furthermore, in the alternative to all legal remedies sought herein, Plaintiffs, on behalf of the Class, seek monetary relief including but not limited to restitution to Plaintiffs and Class members of money or property that Defendants may have acquired by means of Defendants' unlawful, and unfair business practices; restitutionary disgorgement of all profits accruing to Defendants because of Defendants' unlawful and unfair business practices; declaratory relief; and attorneys' fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

**COUNT IX**
**VIOLATION OF CALIFORNIA CONSUMER RECORDS ACT**
**CAL. CIV. CODE § 1798.80 *ET SEQ.* ("CCRA")**

**(On Behalf of Plaintiffs and the Classes, or, alternatively, the California Sub-Class)**

340.  Plaintiffs restate and reallege all of the foregoing paragraphs as if fully set forth herein.

341.  Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to

79

have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the most expedient time possible and without unreasonable delay . . . ."

342. The CCRA further provides: "Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b).

343. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

    a.    The security breach notification shall be written in plain language;

    b.    The security breach notification shall include, at a minimum, the following information:

        i.    The name and contact information of the reporting person or business subject to this section;

        ii.    A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

        iii.    If the information is possible to determine at the time the notice is provided, then any of the following:

            1.  The date of the breach;

            2.  The estimated date of the breach; or

            3.  The date range within which the breach occurred. The notification shall also include the date of the notice.

        iv.    Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

        v.    A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi.  The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

344.  The Data Breach described herein constituted a "breach of the security system" of Defendants.

345.  As alleged above, Defendants unreasonably delayed informing Plaintiffs and Class members about the Data Breach, affecting their Personal and Medical Information, after Defendants knew the Data Breach had occurred.

346.  Similarly, HIPAA and the Health Information Technology for Economic and Clinical Health Act ("HITECH") breach notification rules required Defendants to provide notice of the Data to each affected individual "without unreasonable delay and in no case later than 60 calendar days after the discovery of a <u>breach</u>[.]"[51] 42 U.S.C. § 17932(c); 45 C.F.R. § 164.400-414; *see also* Cal. Civ. Code § 1798.82(e) (providing that a HIPAA covered entity will be deemed to comply with the CCRA notice requirements only "if it has complied completely" with the HITECH notice requirements).

347.  Defendants failed to disclose to Plaintiffs and Class members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendants knew or reasonably believed such information had been compromised.

348.  Defendants' ongoing business interests gave Defendants incentive to conceal the Data Breach from the public to ensure continued revenue.

349.  Upon information and belief, no law enforcement agency instructed Defendants that timely notification to Plaintiffs and Class members would impede its investigation.

350.  As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class members were deprived of prompt notice of the Data Breach and were thus

---

[51] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiffs and Class members because their stolen information would have had less value to identity thieves.

351.  As a result of Defendants' violation of Cal. Civ. Code § 1798.82, Plaintiffs and Class members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

352.  Plaintiffs and Class members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiffs and Class members as alleged above and equitable relief.

353.  Defendants' misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendants conducted with the intent on the part of Defendants of depriving Plaintiffs and Class members of "legal rights or otherwise causing injury." In addition, Defendants' misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by Defendants with a willful and conscious disregard of the rights or safety of Plaintiffs and Class members and despicable conduct that has subjected Plaintiffs and Class members to hardship in conscious disregard of their rights. As a result, Plaintiffs and Class members are entitled to punitive damages against Defendants under Cal. Civ. Code § 3294(a).

## COUNT XI
## INJUNCTIVE / DECLARATORY RELIEF

### (On Behalf of Plaintiffs and the Nationwide Class)

354.  Plaintiffs restate and reallege all of the foregoing Paragraphs as if fully set forth herein.

355.  This count is brought on behalf of all Classes.

356.  This Count is brought under the federal Declaratory Judgment Act, 28 U.S.C. §2201.

357.  As previously alleged, Plaintiffs and Class members entered into an implied

contract that required Defendants to provide adequate security for the Confidential Information they collected from Plaintiffs and Class members.

358.   Defendants owe a duty of care to Plaintiffs and Class members requiring them to adequately secure Confidential Information.

359.   Defendants still possesses Confidential Information regarding Plaintiffs and Class members.

360.   Since the Data Breach, Defendants have announced few if any changes to its data security infrastructure, processes or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent further attacks.

361.   Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class members. In fact, now that Defendants' insufficient data security is known to hackers, the Confidential Information in Defendants' possession is even more vulnerable to cyberattack.

362.   Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class members. Further, Plaintiffs and Class members are at risk of additional or further harm due to the exposure of their Confidential Information and Defendants' failure to address the security failings that lead to such exposure.

363.   There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet Defendants' contractual obligations and legal duties.

364.   Plaintiffs, therefore, seek a declaration (1) that Defendants' existing security measures do not comply with their contractual obligations and duties of care to provide adequate security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

k. Ordering   that   Defendants   engage   third-party   security

auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

l. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

m. Ordering that Defendants audit, test, and train their security personnel regarding any new or modified procedures;

n. Ordering that Defendants segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of Defendants' systems;

o. Ordering that Defendants not transmit Confidential Information via unencrypted email;

p. Ordering that Defendants not store Confidential Information in email accounts;

q. Ordering that Defendants purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

r. Ordering that Defendants conduct regular computer system scanning and security checks;

s. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

t. Ordering Defendants to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Confidential Information to third parties, as well as the steps they

1    must take to protect themselves.

2    365.   Unless such Class-wide prospective injunctive relief is issued, Plaintiffs and

3    Class Members remain at risk, and there is no other adequate remedy at law that would

4    ensure that Plaintiffs (and other consumers) can rely on Defendants' representations

5    regarding its data security in the future.

6    ## **PRAYER FOR RELIEF**

7    **WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Classes,

8    request judgment against the Defendants and that the Court grant the following relief:

9    A.   An order certifying this action as a class action under Federal Rule of Civil

10        Procedure 23, defining the Classes requested herein, appointing the

11        undersigned as Class Counsel, and finding that each of the named Plaintiffs

12        are appropriate representatives of the certified Classes;

13   B.   Injunctive relief requiring Defendants to (1) strengthen their data security

14        systems that maintain personally identifying information to comply with the

15        applicable state laws alleged herein (including, but not limited to, the

16        California Customer Records Act) and best practices under industry

17        standards; (2) engage third-party auditors and internal personnel to conduct

18        security testing and audits on Defendants' systems on a periodic basis; (3)

19        promptly correct any problems or issues detected by such audits and testing;

20        and (4) routinely and continually conduct training to inform internal security

21        personnel how to prevent, identify and contain a breach, and how to

22        appropriately respond;

23   C.   An order requiring Defendants to pay all costs associated with class notice

24        and administration of class-wide relief;

25   D.   An award to Plaintiffs and all members of the Classes of compensatory,

26        consequential, incidental, nominal, and statutory damages, restitution, and

27        disgorgement, in an amount to be determined at trial;

28   E.   That the Court award statutory damages, trebled, and/or punitive or

85

exemplary damages, to the extent permitted by law, including but not limited to the following:

    i.    Compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorneys' fees not to exceed one thousand dollars ($1,000), and the costs of litigation under Civil Code § 56.35;

    ii.    Nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1);

    iii.    Actual damages suffered, according to proof, for each violation under Civil Code §56.36(b)(2);

    iv.    Damages pursuant to Civil Code §§ 1798.84(b);

    v.    Injunctive relief pursuant to Civil Code § 1798.84(e); and

    vi.    All other damages, injunctive relief, attorneys' fees, expenses and costs permitted by law or statute.

F.    An award of credit monitoring and identity theft protection services to Plaintiffs and all members of the Classes;

G.    An award of attorneys' fees, costs, and expenses, as provided by law or equity;

H.    An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

I.    An order requiring Defendants to pay pre-judgment and post-judgment interest, as provided by law or equity; and

J.    Any such other and further relief as this Court may deem just and proper.

Dated: May 2, 2022        By:  */s/ Abbas Kazerounian*

Abbas Kazerounian (SBN 249203)
Mona Amini (SBN 296829)
**KAZEROUNIAN LAW GROUP APC**
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
(800) 400-6808; Fax: (800) 520-5523
ak@kazlg.com
mona@kazlg.com

John Yanchunis (*pro hac vice*)
Ryan D. Maxey (*pro hac vice forthcoming*)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908; Fax (813) 222-4795
jyanchunis@ForThePeople.com
rmaxey@ForThePeople.com

William B. Federman (*pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560; Fax; (405) 239-2112
wbf@federmanlaw.com

*Interim Co-Lead Class Counsel*

Daniel S. Robinson (SBN 244245)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
drobinson@robinsonfirm.com

Patrick N. Keegan, Esq. (SBN 167698)
**KEEGAN & BAKER, LLP**
2292 Faraday Avenue, Suite 100
Carlsbad, CA 92008
(760) 929-9303; Fax: (760) 929-9260
pkeegan@keeganbaker.com

*Interim Co-Liaison Class Counsel*

*Attorneys for Plaintiffs and the*
*Proposed Classes*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues in this action so triable of right.

Dated: May 2, 2022   By: */s/ Abbas Kazerounian*
          Abbas Kazerounian (SBN 249203)
          Mona Amini (SBN 296829)
          **KAZEROUNIAN LAW GROUP APC**
          245 Fischer Avenue, Unit D1
          Costa Mesa, California 92626
          (800) 400-6808; Fax: (800) 520-5523
          ak@kazlg.com
          mona@kazlg.com

          John Yanchunis (*pro hac vice*)
          Ryan D. Maxey (*pro hac vice forthcoming*)
          **MORGAN & MORGAN**
          **COMPLEX LITIGATION GROUP**
          201 N. Franklin Street, 7th Floor
          Tampa, Florida 33602
          (813) 559-4908; Fax (813) 222-4795
          jyanchunis@ForThePeople.com
          rmaxey@ForThePeople.com

          William B. Federman (*pro hac vice*)
          **FEDERMAN & SHERWOOD**
          10205 North Pennsylvania Avenue
          Oklahoma City, OK 73120
          (405) 235-1560; Fax; (405) 239-2112
          wbf@federmanlaw.com

          *Interim Co-Lead Counsel*

          Daniel S. Robinson (SBN 244245)
          **ROBINSON CALCAGNIE, INC.**
          19 Corporate Plaza Drive
          Newport Beach, CA 92660
          (949) 720-1288; Fax (949) 720-1292
          drobinson@robinsonfirm.com

          Patrick Keegan (SBN 167698)
          **KEEGAN & BAKER LLP**
          2292 Faraday Avenue, Suite 100
          Carlsbad, CA 92008
          (760) 929-9303; Fax: (760) 929-9260
          pkeegan@keeganbaker.com

          *Interim Co-Liaison Counsel*

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

     I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, California 92626. On May 2, 2022, I served the within document(s):

### **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

☒      CM/ECF - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m.  The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record who are registered with the Court's CM/ECF system.

     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on May 2, 2022, at Costa Mesa, California.

                                    _/s/ *Abbas Kazerounian*_
                                      ABBAS KAZEROUNIAN